FILED
COURT OF APPEALS
DIVISION II

2014 JUL 15 AM 10: 45

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Personal Restraint of | No. 44691-0-II |
| MARK LEE MILLER, | UNPUBLISHED OPINION |
| Petitioner. | |

LEE, J. — In January 2013, the Indeterminate Sentence Review Board (ISRB) revoked Mark Lee Miller's parole and returned him to prison. Miller filed this personal restraint petition (PRP) alleging that he is under unlawful restraint due to the ISRB's order revoking his parole. Miller alleges that the legislation repealing the sunset provision that would have abolished the ISRB violated Wash. Const. art. II, § 19. We reject Miller's argument and hold that the legislation is constitutional. Miller also raises several issues related to the ISRB's order rescinding his 2010 Conditional Discharge from Supervision (CDFS), but Miller waived these challenges by failing to file a PRP challenging the order rescinding his CDFS at the time the ISRB entered it. Finally, Miller argues that his parole revocation was improper because (1) the ISRB failed to hold a parole revocation within 30 days of serving him with notice of the violations, (2) the Department of Corrections (DOC) did not have the authority to perform an on-site drug test, and (3) there was insufficient evidence to support the ISRB's findings that he violated the conditions of his parole. We disagree and deny Miller's petition.

FACTS

On November 9, 1979, Miller pleaded guilty to one count of first degree robbery and was granted a five year deferred sentence. After Miller committed a series of robberies in Oregon, the Clark County Superior Court revoked his deferred sentence and sentenced him to a maximum term of 40 years incarceration. The ISRB set a minimum term of 33 months. In November 1993, the ISRB released Miller on parole. Between 1993 and 2008, Miller violated the conditions of his parole on several occasions. In 2009, the ISRB again granted Miller parole and released him to a CDFS. In November 2010, Miller's Community Corrections Officer (CCO) filed a notice of violation, alleging that Miller violated the conditions of his CDFS by stabbing one person and threatening to kill another person. However, the victims and witnesses did not cooperate with law enforcement, and the case was dismissed. On December 9, 2010, the ISRB returned Miller to CDFS.

On December 20, 2011, Miller's CCO, Ronda Nielsen, filed a report with the ISRB requesting that Miller's CDFS be rescinded and that he be returned to active supervision. Nielsen stated that, since being released on the CDFS, Miller had been arrested seven times:

1. July 2010 – first degree assault and harassment

2. January 2011 – violation of a protection order

3. May 2011 – disorderly conduct

4. July 2011 – third degree driving while license suspended

5. August 2011 – first degree criminal trespass and disorderly conduct

6. September 2011 – second degree burglary and third degree theft

7. December 2011 – unlawfully harboring a minor

2

ISRB Ex. 27 at 1. Nielsen stated that after Miller's arrest in December 2011, the local police department reported Miller's arrests and requested that the ISRB take action. Nielsen recommended that the ISRB rescind Miller's CDFS and place him back on active supervision. The ISRB rescinded Miller's CDFS and placed him back on active supervision with the following conditions:

> 1. You must not use, possess or control any mind or mood-altering substances, drugs, narcotics, controlled substances, or drug paraphernalia without a valid prescription from a licensed physician.
> 2. You must not use, possess, or control any alcohol.
> 3. You must submit to periodic and random drug and/or alcohol monitoring through an agency approved by your CCO and sign a full release of information allowing the treatment or monitoring agency to release information to your CCO and the Indeterminate Sentence Review Board (ISRB).
> 4. You will not have contact with known felons without PRIOR permission of your CCO, and then only in the context of a treatment group or employment.

Pet'r's. Ex. 2.

On July 5, 2012, CCO Nielsen submitted a notice of parole violation based on Miller using illegal drugs. The ISRB ordered Miller's parole reinstated with the additional condition that he obtain a drug and alcohol evaluation and comply with all recommendations. On July 25, Nielsen submitted another notice of violation based on Miller possessing alcohol and failing to report as directed. The ISRB again reinstated Miller's parole with the conditions that Miller obtain a drug and alcohol evaluation within 15 days and report weekly.

On November, 9, 2012, CCO Nielsen submitted another notice of violation, alleging that Miller failed to report as directed, failed to report a change of residence, and failed to obtain a drug and alcohol evaluation as ordered. Nielsen also noted that Miller had recently been arrested

for resisting arrest and second degree possession of stolen property. On December 31, Nielsen submitted a notice of two additional violations: using methamphetamines and using opiates.

On January 8, 2013, the ISRB held a parole revocation hearing to address all five alleged parole violations. Miller was represented by an attorney at the revocation hearing. Miller pleaded guilty to the alleged violations that he failed to report and failed to obtain a drug and alcohol evaluation. The ISRB found Miller not guilty of the alleged violation that he failed to report a change of address. Miller's attorney objected to the ISRB considering the allegations regarding illegal drug use because the only evidence supporting the allegations was inadmissible hearsay. The ISRB ruled that the allegations would be considered based on the testimony of the CCOs and any finding would not be based on inadmissible hearsay. The CCOs testified as follows:

> CCO Nielson testified that Mr. Miller reported to the DOC office on December 27, 2012 and a urine sample was collected. CCO Conrad was present in the men's bathroom and he witnessed Mr. Miler urinate into the sample cup. Both CCOs and Mr. Miller then went to the UA [urinalysis] room and observed that the sample indicated positive for the presence of Methamphetamine and Opiates. Mr. Miller requested that the sample cup be sent to a laboratory for confirmation. CCO Nielson spoke with her supervisor and it was determined that the necessary criteria for additional testing as required by new DOC policy had not been met. When asked, Mr. Miller denied using any illegal drugs, then said that it was possible the test was positive because he saw some white powdery substance in the bottom of his purse and that he stuck his finger into it to see what it was. He indicated that it tasted bitter and that it could be Opiates but that it did not taste like Methamphetamine. Mr. Miller was arrested and has been in custody since this occurred.
>
> CCO Nathaniel Conrad was contacted telephonically and sworn in. He testified that the UA sample cup was sealed when he accompanied Mr. Miller in the bathroom. Mr. Miller took off his jacket and laid it aside. CCO Conrad then unsealed the cup and Mr. Miller urinated into it. CCO Conrad took possession of the cup and it was in his control as they walked to the UA room. He observed the sample results to test positive for Methamphetamine and Opiates and negative for

4 other substances. After it was decided that the sample cup would not be sent to the lab, it was discarded.

Pet'r's Ex. 7 at 3. The ISRB found that the CCOs' testimony was not hearsay because they testified to "first-hand observations." Pet'r's Ex. 7 at 4. The ISRB found Miller guilty of using illegal substances and, per agreement, combined the two alleged violations into one violation.

The ISRB revoked Miller's parole stating:

> The [ISRB] has tried repeatedly to work with Mr. Miller, recognizing the length of time he has served in prison and under supervision in the community. However, when paroled and especially while not under active supervision he has continually demonstrated an ongoing disregard for appropriate behavior and rule following. His attitude and actions clearly do not meet the statutory standard of being totally rehabilitated and as a result the Board has the responsibility to return him to prison.

Pet'r's Ex. 7, at 5. Miller now files this PRP alleging that his current restraint is unlawful.

ANALYSIS

A. WASH. CONST. ART. II, § 19

Miller argues that the legislation repealing the sunset provision that would have abolished the ISRB violates Wash. Const. art. II, § 19. Essentially, Miller argues that because the legislation was unconstitutional, the ISRB ceased to exist, at least as to its authority to supervise offenders sentenced prior to 1984, in 2008. Miller is mistaken. The legislation repealing the sunset provision abolishing the ISRB does not violate Wash. Const. art. II, § 19.

Former RCW 9.95.0011(1) (1997) stated that the ISRB would "cease to exist on June 30, 2008." In 2001, the legislature passed Third Engrossed Substitute Senate Bill (S.B.) 6151,: "AN ACT Relating to the management of sex offenders in the civil commitment and criminal justice

5

systems." S.B. 6151, LAWS OF 2001, 2d Spec. Sess., ch. 12, at 2196. Among other things, the act repealed former RCW 9.95.0011. LAWS OF 2001, 2d Spec. Sess., ch. 12, § 501.

Wash. Const. art. II, § 19 states, "No bill shall embrace more than one subject, and that subject shall be expressed in the title." Wash. Const. art. II, § 19 established two specific rules: (1) the single subject rule, and (2) the subject-in-title rule.[1] *State v. Stannard*, 134 Wn. App. 828, 834, 142 P.3d 641 (2006) (citing *Citizens for Responsible Wildlife Mgmt. v. State*, 149 Wn.2d 622, 632, 71 P.3d 644 (2003)). "A party challenging the statute's constitutionality bears the

---

[1] To the extent that Miller argues that S.B. 6151 violates that subject-in-title rule, his argument is meritless. "The title satisfies the subject in title requirement 'if it gives notice that would lead to an inquiry into the body of the act, or indicate to an inquiring mind the scope and purpose of the law.'" *Wash. State Grange v. Locke*, 153 Wn.2d 475, 497, 105 P.3d 9 (2005) (quoting *Young Men's Christian Ass'n v. State*, 62 Wn.2d 504, 506, 383 P.2d 497 (1963)). Here, the full title of the act reads:

> AN ACT Relating to the management of sex offenders in the civil commitment and criminal justice systems; amending RCW 71.09.020, 36.70A.103, 36.70A.200, 9.94A.715, 9.94A.060, 9.94A.120, 9.94A.190, 9.94A.390, 9.94A.590, 9.94A.670, 9.95.005, 9.95.010, 9.95.011, 9.95.017, 9.95.020, 9.95.032, 9.95.052, 9.95.055, 9.95.064, 9.95.070, 9.95.080, 9.95.090, 9.95.100, 9.95.110, 9.95.115, 9.95.120, 9.95.121, 9.95.122, 9.95.123, 9.95.124, 9.95.125, 9.95.126, 9.95.130, 9.95.140, 9.95.190, 9.95.250, 9.95.280, 9.95.290, 9.95.300, 9.95.310, 9.95.320, 9.95.340, 9.95.350, 9.95.360, 9.95.370, 9.95.900, 9A.28.020, 9A.36.021, 9A.40.030, 9A.44.093, 9A.44.096, 9A.44.100, 9A.76.— and 72.09.370; reenacting and amending RCW 9.94A.030, 9.94A.320, 18.155.020 and 18.155.030; adding new sections to chapter 71.09 RCW; adding new sections to chapter 72.09 RCW; adding new sections to chapter 9.94A RCW; adding new sections to chapter 9.95 RCW; adding a new section to chapter 4.24 RCW; creating new sections; ***repealing RCW 9.95.0011 and 9.95.145***; prescribing penalties; providing an effective date; providing expiration dates; and declaring an emergency.

LAWS OF 2001, 2d Spec. Sess., ch. 12, at 2196 (emphasis added). The subject at issue (repeal of former RCW 9.95.0011) is clearly expressed in the title of S.B. 6151.

heavy burden of establishing its unconstitutionality beyond a reasonable doubt." *Amalgamated Transit Union Local 587 v. State*, 142 Wn.2d 183, 205, 11 P.3d 762, 27 P.3d 608 (2000).

To determine whether legislation violates the single subject rule, this court must first determine whether the title is general or restrictive. *Stannard*, 134 Wn. App. at 835. Miller argues that ESSB 6151 has a restrictive title because it specifically references sex offenders. But, to be considered a general title, the title "need not contain a general statement of the subject of an act; rather, 'a few well-chosen words, suggestive of the general subject stated, is all that is necessary.'" *Stannard*, 134 Wn. App. at 836 (quoting *Amalgamated*, 142 Wn.2d at 209) (internal quotations omitted). Here, the title of ESSB 6151 broadly references both the civil commitment system and the criminal justice system. Therefore, the title should be considered general. *See Amalgamated*, 142 Wn.2d at 193, 216 (holding title "[s]hall voter approval be required for any tax increase, license tab fees be $30 per year for motor vehicles, and existing vehicle taxes be repealed" was general because, read as a whole, the title embraced the general topic of vehicle taxes); *City of Burien v. Kiga*, 144 Wn.2d 819, 825, 31 P.3d 659 (2001) (holding title "[s]hall certain 199 tax and fee increases be nullified, vehicles exempted from property taxes, and property tax increases (except new construction) limited to 2% annually?" was general because the entirety of the title encompassed the general subject of tax relief); *Citizens*, 149 Wn.2d at 632, 636 (holding title "[s]hall it be a gross misdemeanor to capture an animal with certain body-gripping traps, or to poison an animal with sodium fluoroacetate or sodium cyanide?" was general because the specific topics referenced in the title were "merely incidental to the general topic reflected in the title—a ban on methods of trapping and killing animals").

If the legislation has a general title, it does not violate the single subject rule provided that "a rational unity" exists among the subjects addressed in the legislation. *Stannard*, 134 Wn. App. at 839 (citing *Kiga*, 144 Wn.2d at 825-26). Here, there is a rational unity between the section of the S.B. 6151 repealing former RCW 9.95.0011 and its title. The legislature determined that it would use the ISRB as the vehicle for managing sex offenders in the criminal justice system. Repealing former RCW 9.95.0011 was necessary to accomplish this purpose. Accordingly, S.B. 6151 did not violate Wash. Const. art. II, § 19 because it included a section repealing former RCW 9.95.0011.

Miller also provides this court with a list of suggested ways in which the legislature could have crafted the legislation in a way which he believes effectively complies with Wash. Const. art. II, § 19. However, we do not evaluate what the legislature may have done; rather we determine whether Miller has met his burden to prove what the legislature did do was unconstitutional. Miller has failed to prove beyond a reasonable doubt that ESSB 6151 violated Wash. Const. art. II, § 19. Accordingly, his argument must fail.

B. CHALLENGES TO ORDER RESCINDING CDFS

Miller challenges the ISRB's administrative order rescinding his CDFS arguing that the DOC did not have the authority to request that the ISRB rescind his CDFS and that he was entitled to minimum due process protections (notice and an opportunity to be heard) prior to the ISRB rescinding his CDFS and placing him back on active supervision. However, Miller's challenges to the order rescinding his CDFS are not properly before this court. Currently, Miller is under restraint due to the ISRB's order revoking his parole, he is not under restraint from the order rescinding his CDFS. Accordingly, his petition is a challenge to the order revoking his

parole not the order rescinding his CDFS. Moreover, Miller waived his challenges to the order rescinding his CDFS by failing to file a PRP challenging the order when the ISRB rescinded his CDFS. Because Miller failed to challenge the order rescinding his CDFS in a timely manner, when this court could have effectively provided relief, he is not allowed to challenge an order that is no longer the cause of his restraint.

C. VIOLATION OF THE 30-DAY TIMELINE

Miller argues that the ISRB improperly considered the first three alleged violations (failure to report, failure to notify change of address, and failure to obtain drug and alcohol evaluation) because the ISRB did not hold a hearing on the alleged violations within 30 days as required by RCW 9.95.120. But, under *In re Personal Restraint of Knoke*, 17 Wn. App. 874, 876, 565 P.2d 1187 (1977), failure to comply with the 30-day timeline does not deprive the ISRB of jurisdiction over the alleged violations and a hearing does not violate due process unless the delay is unreasonable.

RCW 9.95.120 provides, in relevant part:

> Whenever a paroled prisoner is accused of a violation of his or her parole, other than a commission of, and conviction for, a felony or misdemeanor under the laws of this state or the laws of any state where he or she may then be, he or she shall be entitled to a fair and impartial hearing of such charges within thirty days from the time that he or she is served with charges of the violation of conditions of parole after his or her arrest and detention. The hearing shall be held before one or more members of the board at a place or places, within this state, reasonably near the site of the alleged violation or violations of parole.

In *Knoke*, the petitioner argued that the State's failure to hold his parole revocation within the 30-day timeline of RCW 9.95.120 required dismissal of the parole revocation proceedings. 17 Wn. App. at 876. Division Three of this court rejected his argument stating:

9

> The statutory right to a hearing within 30 days is enforceable by way of mandamus. *January v. Porter*, 75 Wn.2d 768, 453 P.2d 876 (1969). However, RCW 9.95.120 is not jurisdictional, and failure to hold the hearing within 30 days does not entitle the petitioner to dismissal of the parole revocation proceedings.

17 Wn. App. at 876. Further, failure to hold a parole revocation within 30 days does not violate the petitioner's right to due process if the delay is reasonable. *Knoke*, 17 Wn. App. at 876 (citing *Morrissey v. Brewer*, 408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972); *Monohan v. Burdman*, 84 Wn.2d 922, 530 P.3d 334 (1975)). Here, the delay in holding the parole revocation on the alleged violations was not unreasonable. Miller was not in custody during the entire period leading up to the parole revocation hearing; rather the ISRB granted him conditional release pending the parole revocation hearing. Further, Miller had pending criminal charges that may have been relevant to the parole revocation hearing. Therefore, any delay in the parole revocation hearing should not be considered unreasonable and Miller is not entitled to relief based on the ISRB's failure to hold a hearing on the first three alleged parole violations within 30 days of Miller being provided notice of the alleged violations.

D. DOC AUTHORITY TO CONDUCT UA

Miller asserts that, under the terms of his parole, the DOC did not have authority to administer his UA. One of the conditions imposed after Miller was returned to active supervision stated:

> You must submit to periodic and random drug and/or alcohol monitoring through an agency approved by your CCO and sign a full release of information allowing the treatment or monitoring agency to release information to your CCO and the Indeterminate Sentence Review Board (ISRB).

Pet'r's Ex. 2. Miller relies on principles of civil contract law to argue that the stated condition establishes a third party agency as the exclusive method of obtaining a UA and that, as a result, the DOC was divested of legal authority to conduct a UA. But, orders imposing conditions of parole are not civil contracts. Nothing in the stated section prohibits the DOC from performing a UA. Moreover, by December 27, 2012, when Miller's CCOs obtained the UA, Miller had repeatedly failed to contact a third party agency to obtain monitoring or a drug and alcohol evaluation as previously ordered. Accordingly, we reject Miller's assertion that the DOC could not perform a UA as part of random drug and alcohol monitoring.

E. INADMISSIBLE HEARSAY

Miller argues that the ISRB violated WAC 381-70-400 when it found him guilty of using illegal drugs based exclusively on inadmissible hearsay. Miller is incorrect. The ISRB did not rely on any inadmissible hearsay when finding him guilty. Thus, there was no violation of WAC 381-70-400.

WAC 381-70-400 provides that "[i]f the sole evidence to support the allegation is hearsay that would be inadmissible in a superior court proceeding and is not substantiated or corroborated, the board shall not enter a finding of guilt." Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Here, CCOs Nielson and Conrad testified about their own actions and first-hand observations, which are not hearsay. The sole "hearsay" contained in Nielsen's and Conrad's testimony was Miller's statements. And, Miller's statements are not hearsay in an action in which he is a party. ER 801(d)(2)(i) (admission by party-opponent is not

11

hearsay). Because Nielson's and Conrad's testimony did not contain inadmissible hearsay, the ISRB did not violate WAC 381-70-400.

F. SUFFICIENCY OF THE EVIDENCE

Finally, Miller states that there was insufficient evidence to support the ISRB's finding that he used illegal drugs. At a parole revocation hearing, an alleged violation must be proven by a preponderance of the evidence. RCW 9.95.125; WAC 381-70-160(6). "Preponderance of the evidence means evidence that is more probably true than not true." *In re Welfare of Sego*, 82 Wn.2d 736, 739 n.2, 513 P.2d 831 (1973) (citing *Presnell v. Safeway Stores, Inc.*, 60 Wn.2d 671, 374 P.2d 939 (1962)). Here, both CCO Nielson and CCO Conrad testified that they observed Miller's urine sample test positive for methamphetamines and opiates. Therefore, there was sufficient evidence to support the ISRB's finding that the allegations Miller used illegal drugs was proven by a preponderance of the evidence.

No. 44691-0-II

We deny Miller's petition.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public records in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Hunt, J.

Bjorgen, A.C.J.

13